(C.D. 4269)

G. A. F. Corp.
George S. Bush & Co., Inc. } *v.* United States

United States Customs Court, First Division

(Decided September 17, 1971)

*Glad & Tuttle* (*George Tuttle* and *Hudson F. Edwards* of counsel) for the plaintiffs.

*L. Patrick Gray, III*, Assistant Attorney General (*John A. Winters* and *Joseph I. Liebman*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: The problem before us in this case concerns the proper tariff status of "heat filter glass" that was imported from Japan via the port of Portland, Oregon in 1967. The merchandise was classified upon importation under item 708.09 of the tariff schedules as other optical elements not mounted and assessed duty of 42.5 percent. Plaintiffs protest and claim the imports are properly classifiable under item 722.50 as parts of projectors, dutiable at 35 percent. We sustain the protest.

The relevant statutory provisions are as follows:

<u>Classified under</u>:

<u>Schedule 7, Part 2, Subpart A</u>:

<u>Subpart A headnotes</u>:

    1. The provisions for optical elements in this subpart do not cover—
        (i) unmounted optical elements of glass or synthetic optical crystals unless such elements have been optically worked (see part 3A of schedule 5) ;

    \*        \*        \*        \*        \*        \*        \*

    2. The term "optically worked", as used in this subpart, means that the glass or the synthetic optical crystals have been subjected to grinding or polishing incident to surface shaping for producing optical properties.

      \*        \*        \*        \*        \*        \*        \*

    Lenses, prisms, mirrors, and other optical elements, all of the foregoing whether mounted or not mounted:
        Not mounted:

 \*        \*        \*        \*        \*        \*        \*

708.09       Other _____       42.5% ad val.

<u>Claimed under</u>:

<u>Schedule 7, Part 2, Subpart F</u>:

    <u>Subpart F headnotes</u>:

    1. This subpart does not cover—
        (i) optical elements other than photographic filters (see subpart A of this part) ;

    \*        \*        \*        \*        \*        \*        \*

Projectors, and combination camera-projectors, with or without sound reproducing, or sound recording and reproducing, systems:

\*    \*    \*    \*    \*    \*    \*

722.50   Parts of any of the foregoing projectors or camera-projectors _____   35% ad val.

The imports consist of small disks made of heat filtering glass and are used to trap infra-red or heat rays in various types of film projectors so as to protect the film from overheating and consequent damage. Thus, the imports are used in plaintiff G.A.F.'s 100 and 300 watt slide projectors and in its 8mm movie projector which comes equipped with a still feature. In the slide projectors, the transparency or slide, when in a viewing position, is exposed to the heat of the projector bulb. This heat would cause damage to the film save for the interposition of the imported heat filter between the bulb and the slide which traps the heat from the high wattage of the light and permits only the visible light to pass through.

In the 8mm motion picture projector, when a moving picture is actually being projected, the heat filter is not interposed since the continuous motion of the film prevents it from being damaged by heat. The still feature in that projector, however, gives the user the option of stopping the action and viewing a single motion picture frame as a still. When this is done, the stationary film is subjected to the heat of the projector bulb and would be damaged without the heat filter to protect it. For that reason, as the control knob is turned to employ the still feature, it simultaneously pops the heat filter into position between the projection bulb and the film to protect the film from damage. Subsequently, when the motion picture film viewing is resumed, the heat filter is positioned back into its storage position away from the light and the film.

Light, it is to be noted, consists of electro-magnetic radiation of different wave lengths. Visible light has wave lengths which are between 4000 and 7500 angstrom units. Light waves shorter than this—i.e., from 2000 to 4000 angstroms—are known as ultra-violet rays and are invisible, while those that are longer—i.e., from 7500 to 10,000 angstroms—are also invisible and are known as infra-red rays or heat. These longer infra-red rays (as we have seen) are trapped by the imported heat filter glass while the shorter wave lengths of visible light are allowed to go through unimpeded.

The present importations were ground and polished prior to their shipment to the United States, the purpose being to prevent diffusion and distortion which would impede the transmission of visible light through the filter. Further, glass of the same type as that used in the imported heat filter is also used in the glazing of certain parts of build-

ings to trap infra-red rays from the sun and thus prevent rooms from overheating.

Turning now to the legal aspects, in order for an article to be classified under item 708.09 as an unmounted "optical element," schedule 7, part 2, subpart A headnote 1(i) (which has been previously quoted) requires (1) that the article consist of an unmounted optical element; *and* (2) that it be composed of "optically worked" glass or synthetic optical crystals, or of any other material whether or not "optically worked." As the *Tariff Classification Study*, Schedule 7 (1960) points out (p. 141):

> Items 708.05 through 708.09 embrace unmounted optical elements, other than lenses, used in all kinds of instruments, and composed of optically-worked glass or synthetic optical crystals, or of any other material whether or not optically worked. Such optical elements include prisms, presently dutiable as scientific glassware in paragraph 218(a) or as parts of various optical instruments in paragraph 228; mirrors, currently classified under a number of provisions in paragraph 228(b); and other optical elements, such as optical flats, diffraction gratings, and polarizing elements, now dutiable under a number of provisions.

Against this background, the basic issue in the case is whether or not the imported heat filter glass disk constitutes an "optical element" within the meaning of item 708.09. In this connection, the common meaning of the term "optical" has been a frequent subject of judicial interpretation particularly as it relates to optical instruments and the courts have consistently held that the term relates to the phenomena of light and vision, and that an optical instrument is one that aids human vision or creates for inspection a picture or image of some object. As the court stated in *United States* v. *Bliss & Co. et al.*, 6 Ct. Cust. Appls. 433, 440, T.D. 35980 (1915):

> The fact that light is the foundation of vision is doubtless the reason why the science of optics is said to relate not only to the organs of vision but to light itself and doubtless accounts for what we think is the fact, that in the common understanding of the term "optical" relates to the phenomena of both light and vision. They are inseparable, because light itself is "the sensation of which one becomes conscious through the optic nerve."

> The importations here are not "optical instruments" so far as the phenomena of vision is embraced in the meaning of the word "optics"; that is, they do not aid vision, nor are they so intended.

See also, e.g., *Clara M. Ferner, etc.* v. *United States*, 23 Ct. Cust. Appls. 62, T.D. 47735 (1935); *F. W. Myers & Co., Inc.* v. *United States*, 48 Cust. Ct. 420, Abstract 66694 (1962); *Henry Wild Surveying Instrument Supply Co. of America et al.* v. *United States*, 30 Cust. Ct. 13, C.D. 1492 (1953); *Engis Equipment Company* v. *United States*,

62 Cust. Ct. 29, 32, C.D. 3670, 294 F. Supp. 964, 967 (1969), and cases cited.

The following lexicographic definitions similarly indicate that the common meaning of the term "optical" refers to the relationship between light and vision:

*Funk & Wagnalls New "Standard" Dictionary of the English Language, 1952—*

optical, 1. Of or pertaining to the science of optics. 2. Of or pertaining to the eyesight; assisting vision; * * *.

\* \* \* \* \* \* \*

optics, physics. The science that treats of light and vision, the organs of sight, chromatics, and all concerned with the phenomena of sight.

*Webster's Third New International Dictionary, Unabridged, 1961—*

optical 1a: relating to the science of optics * * * 2: relating to vision * * *.

optics: a science that deals with light, its genesis and propagation, the effects that it undergoes and produces, and other phenomena closely associated with it * * *.

Further, the common meaning of the term "light" refers to *visible* light as the following dictionary definitions make clear:

*Funk & Wagnalls New "Standard" Dictionary of the English Language, 1952—*

light, n. 1. (1) That form of radiant energy or movement of the ether-waves which is capable of acting upon the eye in such a way as to make visible the object from which it comes; the illumination or radiance that is apprehended by the sense of vision * * *.

The chief phenomena concerned, whose existence is independent of any theory, are reflection, refraction, dispersion, interference, and polarization. * * * According to the undulatory theory, now generally received, radiant energy is propagated in waves that vary in length, and only those that affect the eye are known as *light*, the other being spoken of as dark heat, chemical rays, etc. according to the effect they are regarded as producing * * *.

*Webster's Third New International Dictionary, Unabridged, 1961—*

light. 1a: something that makes vision possible b: the sensation aroused by stimulation of the visual pathways * * * c: an electromagnetic radiation in the wavelength range including infrared, visible, ultraviolet, and X rays and traveling in a vacuum with a speed of about 186,281 miles per second; *specif:* the part of this range that is visible to the human eye and extends approximately from a wavelength of 3900 angstroms to a wavelength of 7700 angstroms * * *.

To like effect is the testimony of defendant's expert witness—a professor of physics and chairman of the department of physics at a major university—that "ordinarily, when one talks about light, you mean visible light." (R. 45) The witness indicated, in addition, that wave lengths shorter and longer than the visible light range would usually not be called light but rather ultra-violet and infra-red radiation. (R. 45–6)

There thus is no doubt that the common meaning of light refers only to visible light. However, in contradistinction to this common meaning, defendant's expert witness considered, as a professional physicist, that the heat filtering function of the present importation—i.e., the absorption of *invisible* (infra-red) light waves—falls within the principles of optics—and therefore considered the import to be an optical element. Granted that from a scientific standpoint in the field of physics the term "light" encompasses invisible as well as visible wave lengths of electro-magnetic radiation. However, "tariff laws are not drafted in the terms of science, but in the language of commerce, which is presumptively that in common use." *Hummel Chemical Co.* v. *United States*, 29 CCPA 178, 183, C.A.D. 189 (1941). And in common use—to repeat what we have said previously—the term "optical" refers to the phenomena of light and vision, and an optical system of an instrument is one that aids vision or creates for inspection a picture or image of some object. In this context, the term "optical element" as used in item 708.09 refers in its common meaning to a component that performs an essential function in the operation of the optical system. E.g., *Engis Equipment Company* v. *United States, supra,* 62 Cust. Ct. at 32.

Measured by this test, we think it clear that the imported heat filter is not an "optical element" and thus does not come within the purview of item 708.09. For the record establishes without dispute that its sole function is to trap infra-red heat emanating from the light source (bulb) of the particular projector and thereby protect the film from damage by the heat. The import does not in any manner affect visible light or have any optical function whatever in the projector from the standpoint of aiding vision or creating for inspection a picture or image of an object. Indeed, it is completely independent, by function and construction, from the image forming lens of the projector.

Defendant claims alternatively that if the imported heat filters are not properly classifiable under the assessed provision item 708.09, they are classifiable as optical glass under item 540.67 which provides as follows:

> Optical glass in any form, including blanks for spectacle lenses and for other optical elements; * * * all the foregoing not optically worked; * * *

    \*    \*    \*    \*    \*    \*    \*

540.67        Other optical glass and synthetic optical crystals; polarizing material__    50% ad val.

"* * * [O]ptical glass," it is to be noted, "is of very high quality, and is such as is used for optical instruments." *Semon Bache & Co. v. United States*, 25 CCPA 239, 243, T.D. 49339 (1937). However, defendant has made no showing whatever that the imported heat filter glass consists of glass meeting such specifications. Second, it is apparent from the foregoing definition that in order for an article to be classified as "optical glass" it must be capable of performing an optical function—e.g., aiding vision. But as we have previously discussed, the present importation is incapable of performing any optical function whatever in the projector. For these reasons, defendant's alternative claim is without merit.

Coming now to plaintiffs' affirmative claim for classification of the imports under item 722.50 as parts of projectors, the record shows that in their imported condition the articles are dedicated to and solely used with the film projectors previously mentioned and in such capacity serve a necessary and important purpose in preventing the film from overheating. We therefore hold that the imports are properly classifiable under item 722.50 as parts of projectors, dutiable at 35 percent, as claimed by plaintiffs.[1] Judgment will be entered accordingly.

(C.D. 4270)

BALFOUR, GUTHRIE & Co., LTD. *v.* UNITED STATES

---

[1] Defendant does not dispute that the imports are parts of projectors; its argument rather is that item 708.09, under which the classification was made, or item 540.67 (defendant's alternative classification) are both specific provisions covering the imports which, by virtue of General Interpretative Rule 10(ij), prevail over the "parts" provision. However, for the reasons heretofore discussed, the imports do not fall within the purview of either item 708.09 or 540.67.