G. HEILEMAN BREWING CO., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 84–12–01779

(Dated September 6, 1990)

*Ross & Hardies,* (*Joseph S. Kaplan* at trial and on the briefs, *Salvatore E. Caramagno* on the briefs), for plaintiff.

*Stuart M. Gerson,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch (*Michael T. Ambrosino* at trial), for defendant.

RE, *Chief Judge*: The question presented in this case pertains to the proper classification, for customs duties purposes, of certain merchandise described on the customs invoices as "ceramic steins." The merchandise was imported from Brazil, and entered at the port of Baltimore, Maryland.

The merchandise was classified by the Customs Service as "[m]ugs and other steins," under item 533.30 of the Tariff Schedules of the United States (TSUS), with duty assessed at the rate of 13.5 per centum *ad valorem*. Plaintiff protests this classification and contends that the

merchandise is properly classifiable as "art and ornamental articles," under item A534.87, TSUS, duty free under the Generalized System of Preferences, as the product of a beneficiary developing country.

The pertinent statutory provisions of the tariff schedules are as follows:

*Classified Under:*

Schedule 5, Part 2, Subpart C:

Articles chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients:
\* \* \* \* \* \* \*

Of fine-grained earthenware (except articles provided for in item 533.15) or of fine-grained stoneware:
\* \* \* \* \* \* \*

Household ware not available in specified sets:
\* \* \* \* \* \* \*

533.30　　　Mugs and other steins ................ 13.5% *ad val.*

*Claimed Under:*

Schedule 5, Part 2, Subpart C:

Smokers' articles, household articles, and art and ornamental articles such as, but not limited to, statues, figurines, flowers, vases, lamp bases, bric-a-brac, and wall plaques, all the foregoing not specially provided for, of ceramic ware:
\* \* \* \* \* \* \*

Of fine-grained earthenware or of fine-grained stoneware (except articles provided for in items 534.74 and 534.76):
\* \* \* \* \* \* \*

A534.87　　　Valued over $10 per dozen articles ............. free

The question presented is whether the imported ceramic steins have been properly classified as "[m]ugs and other steins," under item 533.30, TSUS, or whether they are properly classifiable as "art and ornamental articles," under item A534.87, TSUS, as maintained by plaintiff.

In order to decide the question presented, the court must consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878, *reh'g denied*, 739 F.2d 628 (Fed. Cir. 1984).

After an examination of the merchandise, exhibits introduced at trial, pertinent tariff provisions, relevant case law, and the testimony of record, it is the holding of the court that the plaintiff has overcome the presumption of correctness that attaches to the classification by Customs. Hence, the imported ceramic steins are properly classifiable as "art and

ornamental articles," under item A534.87, TSUS, as maintained by plaintiff.

At trial, plaintiff presented the testimony of Mr. Gary Perleberg, plaintiff's director of planning and development. Mr. Perleberg stated that, as part of his duties, he assembled all of plaintiff's beer memorabilia, including the mugs or steins produced after 1979. Mr. Perleberg identified two samples of the imported ceramic steins at issue in this case, as well as several photographs of the imported steins. Mr. Perleberg explained that a limited number of steins were produced in each style, and each stein was given a serial number.

Mr. Perleberg testified that, after importation, the ceramic steins were sold at auction. He stated that "the individuals that purchased these steins were antique collectors, and I personally know two of these antique collectors, they purchased the steins for resale." He added that plaintiff's purpose in producing and marketing the steins was to create "a classy advertising piece * * * to reach the consumer in his or her home as a reminder of our advertising campaigns at the then present time. * * *" He stated that plaintiff continues to sell steins, and "[t]he advertising department is responsible for the ordering * * * and is also responsible for the administration of the steins reaching the distributors."

On cross examination, defendant introduced an advertisement of the ceramic steins. The advertisement depicted a ceramic stein filled with beer, and cans of plaintiff's "Old Style" brand beer. Printed above the pictures was: "DRINK IN STYLE. Our 1983 Limited Edition Collector's Stein is the perfect way to drink the perfect beer: fully kraeusened, naturally carbonated Old Style." Defendant also introduced an in-house bulletin that was distributed to plaintiff's beer sales personnel in 1982. The bulletin directed personnel to "SELL STEINS WITH BEER," and stated that "Old Style and Old Style Light can be successfully sold through use of the stein display."

Defendant also introduced a similar bulletin, dated 1983, which stated that "[s]teins will be shipped to wholesalers via beer loads if so designated on the attached order form. * * *" The bulletin also stated: "Host a 'Drink with Style' Stein Night. Consumers can buy a 'Drink With Style' Stein full of Old Style or Old Style Light for $10.00 and get refills that night for $1.00." In addition, defendant presented several of plaintiff's internal memoranda. Mr. Perleberg agreed that all of the memoranda introduced by defendant contained drawings or photographs which "depicted these steins or mugs with beer inside them."

Plaintiff also introduced the testimony of Mr. Lynn Geyer, the owner of a business dealing in "antique breweriana," — i.e., "[a]ntique items that are collectable that pertain to the beer industry." Mr. Geyer stated that he was familiar with the beer industry, both as a consumer and a merchandiser, since 1965. He stated that he had "attend[ed] many shows and many conventions dealing in breweriana."

Mr. Geyer identified the samples of the imported ceramic steins. He also identified several auction catalogs, prepared by his company, which

depicted "a variation of different mugs and steins that have collectable value. * * *" Mr. Geyer identified several of plaintiff's ceramic steins, at issue in this case, which were pictured and offered for sale in his catalogs. He also identified Ceramarte, the manufacturer of the ceramic steins at issue in this case, as a producer of breweriana steins and mugs.

Mr. Geyer testified that breweriana mugs or steins, which "have a brand name on them or a brand identification or a brewer's name with a brewery identification on them[,]" have been collector's items for many years. He stated that breweriana mugs and steins were marketed by breweries and beer manufacturers. Mr. Geyer testified that the purpose of breweriana mugs and steins:

> is to put a piece of advertising in a home that will last for a period of time to enhance brand loyalty. You want to keep the name of your product in front of the consumer as much as possible, mugs were one of the innovations in the early 1900's to do this.

Mr. Geyer testified that breweriana mugs and steins are intended to be collector's items, and stated that they are generally bought and sold by collectors. He added that he had never seen any one drink out of them. He explained that ceramic mugs or steins are not used for drinking because they may be damaged and they "hold[] an inappropriate amount of beer." He noted that the ceramic mugs or steins hold 24 to 30 ounces of beer, whereas most consumers prefer a 12 ounce portion. Mr. Geyer also stated that use of the ceramic mugs or steins may cause chipping or staining, and "[i]f you washed this with continual washings, * * * you would obliterate the advertising on the piece, you would obliterate the colors, therefore, making your collectable basically worthless." He added that, in his opinion, breweriana mugs and steins have artistic value.

Mr. Geyer was asked about the depiction of the ceramic steins, containing beer, in plaintiff's advertisements. He explained that "the mug looks very unattractive without a head of beer on it in an artist's drawing. It's hard to do the shading and the correct proportion in the mug itself, therefore, I'm sure that the artist just put a head on the mug."

Mr. Geyer stated that breweriana mugs or steins are purchased by "three or four individuals that buy in bulk quantities that put out lists that they then sell to the general public or to other collectors." He testified that there are at least 2,000 collectors of breweriana mugs and steins in the United States. Mr. Geyer added that "[t]he collectors will purchase the steins or trade for the steins and keep them as collectable possessions. Some of the collections I've seen have been in glass cases, other ones have been on back bars on glass shelves."

Plaintiff's third witness was Mr. Joseph Patenaude, the co-owner of a small marketing and advertising agency. Mr. Patenaude testified that he had previously been employed as a program director at Franklin Mint, a manufacturer of collectables. He stated that, while with Franklin Mint, he was involved with their production of ceramic steins.

He identified the imported ceramic steins at issue in this case as collectables.

Mr. Patenaude was read the tariff item under which the imported ceramic steins were classified, and stated that "I don't think they describe these articles at all." He explained that:

> [The] articles were not made to drink out of. [In] [m]y opinion[,] [t]hey were made to be collectable, to be collected, to be bought, cherished, displayed, shown to friends, et cetera, but not to be drunk with.
>
>       \*      \*      \*      \*      \*      \*      \*
>
> These are difficult to clean, they're difficult to keep clean, they're difficult to handle, they fill, they're heavy, if used with the common twelve ounce container, they don't fill, therefore they warm up fast.
>
> They're uncomfortable. There's no reason to [use them to] drink beer when you have much better choices than to drink beer out of these.

Mr. Patenaude stated that, in his opinion, "breweries put out items of this nature * * * to put the name of the beer in the home of the beer drinker and user, and act as a constant reminder that he or she should buy that beer next time they're in the store."

As for the depiction of the ceramic steins containing beer, in plaintiff's advertisements, Mr. Patenaude testified that these depictions did not change his opinion on the use and purpose of the steins. He explained that "[i]n order to make these a breweriana collectable associated with the Old Style beer, it has to show that it is indeed capable of holding the beer." He added that "to drink out of these steins or any other cherished collectable , would be to take a chance on reducing its value by injuring it, by chipping it, by cracking it, by breaking it and so forth."

Defendant presented the testimony of Mr. Kenneth Linsner, "an appraiser and valuer of personal property and fine arts." He added that he has valued ceramic steins, "including steins such as those in question here." Mr. Linsner was questioned about several definitions of "stein:"

> 1. [A]n earthenware mug esp[ecially] for beer commonly holding about a pint[.]
>
> 2. [A]ny large thick mug (as of glass) for beer holding sometimes as much as a quart[.]
>
> 3. [T]he quantity of beer that a stein holds[.]

*Webster's Third New International Dictionary* 2235 (1986).

> A beer mug holding usually a pint; also the quantity of beer it contains.

*Funk & Wagnall's Standard Dictionary of the English Language* 1228 (Int'l ed. 1963).

Mr. Linsner added that "in the traditional sense, the beer stein was fine grain earthenware or stoneware having a handle, and usually having a lid. Those are the general characteristics."

Mr. Linsner was asked about collectables. He testified that collectable steins:

> are marketed so that in whatever media that advertising goes on, the degree of limitation is noted, whether or not it be number of firing days or actual number of items, any artists or artist or company connected with the production of the stein is so noted, and any other merchandising characteristics which would enhance the aesthetic or limitation aspects are emphasized.

He added that, generally, the marketing of collectables is "done through gift shops, collectors' societies, magazines that are targeted to households where they might be collecting such material, whether they are specialist magazines or whether they're generalist magazines, promotional fliers and literature directed to the societies of collectors of these items. * * *" He also stated that "[i]f you market something from inception as a collectable, you'll make every attempt to target your marketplace and emphasize those factors that I've discussed." He said that he had never seen collectable drinking vessels depicted in advertisements containing a beverage.

Mr. Linsner was asked specifically about the marketing of the ceramic steins at issue in this case. He stated that although the ceramic steins were claimed to be part of a limited edition, "there is no discussion of how that limitation is to take place or the number of pieces or days of production * * * or order dates that would give a degree to that limitation." He added that "the bulk of the advertising * * * refers not to the steins themselves, but to a beer called Old Style, which may be drunk from the article."

Mr. Linsner stated that, in his appraisals, he generally finds ceramic steins similar to those at issue in this case "[w]ith the utilitarian, everyday china and glassware." He concluded from this fact "that the most common market for this type of material when it's advertised and promoted in this fashion, the ultimate consumer is the general public who uses the item or tries to use the item, considers it unwieldy and puts it away." He also stated that he had seen this type of stein in a "location to catch drips from leaks, * * * with scrubbing pads in them and * * * with everything from toothbrushes to bathroom dishes."

## Discussion

General Interpretative Rule 10(e)(i) provides that:

> a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined. * * *

The chief use of imported merchandise is "'the principal or predominant use. It does not envision exclusive use, but rather contemplates the usual and common use.'" *Teleflora Prods., Inc. v. United States*, 13 CIT

839, Slip Op. 89–144 at 14 (Oct. 16, 1989) (quoting *Howland v. United States*, 53 CCPA 62, 64, C.A.D. 878 (1966)). In addition, "'[a] fugitive use or a mere susceptibility or capability of use is not controlling as to such chief use.'" *Id.* (quoting *Riekes Crisa Corp. v. United States*, 84 Cust. Ct. 132, 145, C.D. 4852 (1980)). In this case, from a review of the testimony and an examination of the merchandise and other exhibits, it is clear that the class or kind of merchandise to which the imported articles belong is not "chiefly used for preparing, serving, or storing food or beverages, or food or beverage ingredients," as provided for in item 533.30, TSUS. Instead, the steins are of the class or kind of articles used for ornamental or decorative purposes.

In *United States v. Carborundum Co.*, 63 CCPA 98, C.A.D. 1172, 536 F.2d 373, *cert. denied*, 429 U.S. 979 (1976), the Court of Customs and Patent Appeals listed the factors that must be examined in order to determine whether imported merchandise is of a certain "class or kind." The *Carborundum* court stated that courts must look to:

> the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed), the use, if any, in the same manner as merchandise which defines the class, the economic practicality of so using the import, and the recognition in the trade of this use.

*Id.* at 102, 536 F.2d at 377 (citations omitted).

An examination of the imported steins reveal that they are highly decorative, and are larger than the typical mugs or steins used to serve beer. According to both Mr. Geyer and Mr. Patenaude, frequent use and washing of the ceramic steins would damage the decoration. In addition, both witnesses testified that, because of the large size of the steins, they are unwieldy and are not well suited for serving beer. It is clear, however, that one may drink beer from the steins. Nevertheless, as stated by the Court of Customs and Patent Appeals in a case involving decorative cups and saucers, "[m]erely because one *can* drink from the imported [merchandise] does not establish the chief use thereof." *United States v. Baltimore & Ohio R.R.*, 47 CCPA 1, 5, C.A.D. 719 (1959) (emphasis in original).

The testimony of Mr. Perleberg revealed that the "ultimate purchasers" of the imported steins were collectors of breweriana and antiques. Mr. Geyer testified to the same effect, and added that purchasers maintained collections of breweriana steins.

In addition to the opinions or expectations of the ultimate purchasers that the imported steins were collectables, it is clear from an investigation of "the channels, class or kind of trade in which the merchandise moves," and "the manner in which the merchandise is advertised and displayed," that the steins are collectables. Mr. Geyer testified extensively about the sale of breweriana to collectors at auctions, and through

catalogs. He identified, in his auction catalogs, one of the styles of imported steins at issue in this case. He added that Ceramarte, the manufacturer that made the imported steins at issue in this case, was known to him as a producer of breweriana steins. Both Mr. Geyer and Mr. Patenaude stated that breweriana steins are generally intended by breweries to be advertisements. More specifically, Mr. Perleberg testified that plaintiff produced the steins at issue in this case in order to advertise its beer, and the production of the steins was supervised by plaintiff's advertising department.

The testimony of plaintiff's witnesses established that the steins were purchased by breweriana collectors, for use as collectables. Hence, this testimony fully supported plaintiff's contention that the steins were chiefly used as collectables.

In addition, it is noteworthy that all three of plaintiff's witnesses were experienced in the production or sale of breweriana ceramic steins. It has been noted that manufacturers and sellers of imported merchandise are competent to testify about the "chief use" of the merchandise. *See Novelty Import Co. v. United States*, 60 Cust. Ct. 574, 582, C.D. 3462, 285 F. Supp. 160, 166 (1968). *See also Jayre California, Inc. v. United States*, 14 CIT 29, Slip Op. 90–6 at 6 (Jan. 22, 1990). In contrast, the defendant's sole witness, Mr. Kenneth Linsner, is a self-employed appraiser of fine arts and personal property. Mr. Linsner had no experience with the production or sale of breweriana ceramic steins, and, indeed, testified that he had never appraised the steins at issue in this case.

Nevertheless, the defendant maintains that "the samples, advertising and merchandising media support the government's findings that the imported steins are chiefly used for serving beverages. * * *" In support of its assertion, defendant refers to the lexicographic definitions of "stein" introduced at trial, during the testimony of Mr. Linsner. These lexicographic definitions indicate that a "stein" is intended to hold beer. The testimony of plaintiff's witnesses, however, indicated clearly that the steins at issue in this case were not intended to hold beer, and are not chiefly used "for preparing, serving, or storing food or beverages, or food or beverage ingredients."

In determining the classification of imported merchandise, the descriptions of the merchandise contained in marketing literature is relevant evidence, but it is not conclusive. *See B & E Sales Co. v. United States*, 9 CIT 69, 76 (1985). The testimony of plaintiff's witnesses explained that plaintiff's marketing literature, which pictured the steins holding beer and stated that the steins could be used to hold beer, did not reflect the "chief use" of the steins. Mr. Patenaude indicated that the purpose the steins were depicted as containing beer was to cause the public to associate them with plaintiff's beer. In addition, Mr. Geyer explained that the steins were drawn containing beer for artistic purposes because they appeared unattractive when drawn empty. Hence, it is clear that, rather than reflecting the chief use of the merchandise, the

depiction of the steins as holding beer was a method or device to advertise plaintiff's beer.

Finally, the court, as in all cases, must make a determination as to what testimony it found most reliable and persuasive. In this case, as in *Schott Optical Glass, Inc. v. United States*, 82 Cust. Ct. 11, C.D. 4783, 468 F. Supp. 1318, *aff'd*, 67 CCPA 32, C.A.D. 1239, 612 F.2d 1283 (1979), there was conflicting testimony as to the characteristics of the imported merchandise. In *Schott Optical*, in determining that the plaintiff had failed to overcome the presumption of correctness that attached to the classification by Customs, the Customs Court thoroughly reviewed the testimony of the witnesses presented by both parties. *See* 82 Cust. Ct. at 20–25, 468 F. Supp. at 1323–27. The court added that "[i]t is important to note that the defendant did not merely rely upon the statutory presumption of correctness [, but] * * * has submitted competent, reliable, and credible affirmative evidence, which the court has found persuasive, to support the presumption [of correctness] * * * ." *Id.* at 24, 468 F. Supp. at 1326.

Unlike *Schott Optical*, in this case plaintiff has successfully rebutted the presumption of correctness that attaches to the classification by Customs. Nevertheless, the reasoning of the court in *Schott Optical* is relevant to this case since here, as in *Schott Optical*, the court's holding is based in part on a determination that one party's witnesses are more persuasive and reliable than the witnesses presented by the other party. *See also Oak Laminates v. United States*, 8 CIT 300, 301, 601 F. Supp. 1031, 1032 (1984), in which this court, in denying the plaintiff's motion for a rehearing, quoted a statement from the defendant's brief that "'[p]laintiff's dissatisfaction with the court's acceptance of one expert's opinion over another's does not render the court's ultimate conclusion based on such opinion erroneous. * * *'"

## CONCLUSION

In view of the foregoing, it is the determination of the court that plaintiff has overcome the presumption of correctness that attaches to the classification by Customs, and that the imported ceramic steins were improperly classified by Customs as "[m]ugs and other steins," under item 533.30, TSUS. It is also the holding of the court that the steins are properly classifiable as "art and ornamental articles," under item A534.87, TSUS, duty free under the Generalized System of Preferences, as the product of a beneficiary developing country, as maintained by plaintiff. Judgment will issue accordingly.